## **CONTINUATION OF AN APPLICATION FOR SEARCH WARRANT**

I, Special Agent Itzel Castro, being first duly sworn, hereby depose and state as follows:

## **INTRODUCTION AND AGENT BACKGROUND**

1.     I make this continuation in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the following:

      a.  **the person of DYLAN ROBERT STEELE, (hereinafter referred to as "STEELE" or "the SUBJECT PERSON")**, including all electronic devices found on his person, as further described in Attachment A-1.

      b.  the PREMISES known as **921 CEDAR ST., NILES, MICHIGAN 49120 (hereinafter referred to as "the PREMISES")**, including any and all vehicles located on the property in the care, custody and control of DYLAN ROBERT STEELE, as more specifically described in Attachment A-2.

2.     I am a Special Agent (SA) with Homeland Security Investigations (HSI) and have been since March 2024.  Prior to my assignment with HSI, I graduated from the University of Texas at El Paso in 2019 with a bachelor's degree in criminal justice and a minor in intelligence and national security. In 2021, I graduated from the Federal Training Centers (FLETC) in Charleston, South Carolina as a Border Patrol Processing Coordinator (BPPC). I worked at the El Paso, Texas, Sector 1, immigration detention center as a BPPC for 6 months. In 2022, I graduated from FLETC in Brunswick, Georgia as an officer with the Customs and Border Protection, Office of Field Operations, and worked in that position at the Douglas, Arizona Port of Entry, where I specialized in both inbound and outbound transportation of merchandise. In 2024, I graduated from

FLETC in Brunswick, Georgia as a Criminal Investigator Special Agent from the Criminal Investigator Training Program and from the Homeland Security Investigation Special Agent Training and was assigned to HSI Midland, Texas, where I am currently stationed.

3.     As part of my duties as a Special Agent, I investigate crimes involving child pornography, including violations of 18 U.S.C. §§ 2251(a) (relating to production of child pornography), 2252A(a) (relating to possession, receipt and distribution of child pornography), and 2422(b) (relating to coercion and enticement of minors to engage in sexual activity). Based on my training, education, and experience, I am familiar with the ways that individuals produce, store, and share images and videos of child pornography. I have completed formal classes and specialized training in child exploitation investigations, where I gained a comprehensive understanding of investigative tools as well as manners in which individuals involved in these types of crimes operate. This educational background has equipped me with the skills necessary to investigate crimes against children.

4.     The facts in this continuation come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This continuation is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.     Based on the facts set forth in this continuation, there is probable cause to believe that violations of 18 U.S.C. §§ 2251(a) (relating to production of child pornography), 2252A(a) (relating to possession and receipt of child pornography), and 1470 (relating to transfer of obscene

2

matter to a minor) have been committed by DYLAN ROBERT STEELE. There is also probable cause to believe that the information described in Attachment B will constitute evidence of these criminal violations and will assist law enforcement in arresting STEELE, who is a "person to be arrested" within the meaning of Federal Rule of Criminal Procedure 41(c)(4).

## STATEMENT OF PROBABLE CAUSE

6.      On or about July 2, 2024, an officer of the Midland Police Department (PD) was dispatched to a residence in Midland, Texas regarding a complainant who reported sexually explicit messages, videos, and other images that an individual using the Snapchat username "docsteele11" (later identified as STEELE,) had exchanged with a 14-year-old female child (hereinafter referred to as "Minor Victim 1" or "MV1")[1] via the social media platform known as Snapchat.  The officer obtained verbal consent from the complainant to review MV1's cell phone, a black TCL a600DL Android cell phone, and capture as evidence the Snapchat communications

---

[1] The full name and date of birth of MV1 are known to me, but due to MV1's age and the nature of the allegations, I have not included this information here to protect the minor's identity.

exchanged between MV1 and the Snapchat account with username "docsteele11." The officer also collected the cell phone as evidence for forensic examination.

7.       On July 19, 2024, the Midland PD obtained and served to Snap, Inc. a state search warrant for information associated with the Snapchat account for the Snapchat username "docsteele11."

8.       On September 17, 2024, in response to the search warrant obtained and served to Snap, Inc., a detective with the Midland PD received from Snap, Inc. information associated with the Snapchat account for the Snapchat username "docsteele11," which the detective reviewed and which was also later provided to the HSI Office of the Resident Agent in Charge in Midland, Texas (HSI-TM). While reviewing the communications received for the "docsteele11" Snapchat account, the detective observed, in the background of videos and images of that account, depictions of a residence that comparison to open-source information revealed to be located at 921 Cedar Street, Niles, Michigan. Review of open-source information also revealed "Dylan Robert Steele" as a name associated with the residence at 921 Cedar Street and that "Dylan Robert Steele" is an approximately 25-year-old male. The detective conducted an open-source search for the name "Dylan Robert Steele" and found a photograph and identifiers matching those of STEELE that were posted on the Michigan Sex Offender Registry website. The detective compared the open-source photographs of STEELE to the photographs of "Doc" from the information content received from Snapchat for the Snapchat account "docsteele11." That comparison confirmed that the open-

source photographs of STEELE depict the same male who is depicted in photographs from the "docsteele11" Snapchat account.

 

9.      On October 4, 2024, a child forensic interview was conducted with MV1. During that interview, in summary and not verbatim, MV1 stated that she knew the user of the "docsteele11" Snapchat account by the name of "Doc." MV1 stated that "Doc" told her that he is a 25year-old man living in Michigan who works for a landscaping company. MV1 further stated that, through Snapchat, "Doc" sent her what she believed were pictures of a penis and then asked

her to send him naked pictures of herself. MV1 stated that she sent "Doc" videos and pictures of her exposed breasts and vagina.

10.    On October 24, 2024, HSI-TM received information from the Midland PD, regarding the Snapchat account with Snapchat username "docsteele11" receiving and storing videos and other images depicting MV1 engaging in sexually explicit conduct. While reviewing the information obtained from Snap, Inc. associated with the Snapchat account "docsteele11," your affiant observed information, including the email address "kidsteele11@gmail.com" as associated with the account, a creation date for the Snapchat account of November 4, 2023, and an IP address of 73.209.178.240 associated with the account and  corresponding with coordinates 41.8298 (41° 49′ 47.17″ N), -86.2542 (86° 15′ 15.05″ W). The coordinates resolve to the intersection of Cedar Street and 10th Street in Niles, Michigan. Your affiant also observed a birthdate listed for the user of the "docsteele11" account that is the same as STEELE's known birthdate. Your affiant also observed the hardware model SM-G998U of an Android cell phone listed as the electronic device used to download the Snapchat application and as associated with login to Snapchat under the

username "docsteele11." Your affiant further observed the Android firmware version also listed as G998USQSBGXF1, which corresponds to a Samsung Galaxy S21 Ultra cell phone.

11.    While reviewing the information obtained from Snap, Inc. associated with the Snapchat account "docsteele11," your affiant further observed that, on June 30, 2024, the "docsteele11" Snapchat account had "friended" MV1 through the Snapchat application.

12.    Your affiant further observed that, on or about July 2, 2024, "docsteele11" and MV1 exchanged sexually explicit messages, videos depicting MV1 engaging in sexually explicit conduct, and other images, including the following:

      a.    docsteele11: "Mmm you alone?"

      b.    MV1: "Yea my [sibling] is in the living room so I have to be quiet"

      c.    docsteele11: "Take another pic of you on your knees for daddy" "But take your shirt off"

      d.    [*MV1 transmitted to docsteele11 an image depicting MV1 on her knees, wearing a light pink brassier and ripped light blue jeans, and taking the photograph with her left hand. MV1's face is visible in the image.*] . . .

      e.    docsteele11: "Should hold the camera above tou [sic] like it's looking down and look up at the camera and stick your tongue out," "Princess?"

      f.    MV1: "Hang on"

      g.    docsteele11: "Ok baby"

h.    [*MV1 transmitted to docsteele11 an image depicting MV1 sticking her tongue out of her open mouth, looking up at the camera, taking the photograph with her left hand, and wearing a light pink brassier and ripped light blue jeans.*]

i.    docsteele11: "Fuckkk that's a good slut". . .

j.    docsteele11: "Be naughty for daddy while he's at work"

k.    MV1: "Yes sir"

l.    docsteele11: "Good girl"

m.    MV1: "What does daddy do for work"

n.    docsteele11: "I'm a supervisor at a landscaping company"

o.    MV1: "Ooo"

p.    docsteele11: "What baby," "Be naughty for daddy"

q.    MV1: "Yes daddy"

r.    docsteele11: "Show me your tits"

s.    [*MV1 transmitted to docsteele11 an image depicting a post-pubescent female's fully nude breasts as the focal point of the image.*]

t.    docsteele11: "Fuck good girl" "Send a bunch baby. Play with that pussy for daddy"

u.    [*MV1 transmitted to docsteele11 a ten (10) seconds video depicting a post-pubescent female's fully nude vulva and a finger rubbing against the labia and entering the vagina.*]

     v.     [*MV1 transmitted to docsteele11 a second ten (10) seconds video depicting a post-pubescent female's vulva and two (2) fingers rubbing against the labia and entering the vagina.*]

13.    From the Midland PD, HSI also received the communications exchanged between "docsteele11" and MV1 that the officer with the Midland PD had captured from MV1's cell phone. While reviewing the captured communications, your affiant observed that between on or about June 30, 2024, and continuing through on or about July 2, 2024, the Snapchat account with Snapchat username "docsteele11" exchanged multiple files with MV1, which included files containing sexually explicit images and videos to MV1's Snapchat account.

14.    While reviewing the communications exchanged between "docsteele11"and MV1 captured from MV1's cell phone, your affiant also observed that, between on or about June 30, 2024, and on or about July 1, 2024, "docsteele11" had sent to MV1 through Snapchat videos that depict a male masturbating by rubbing his penis with his hand and then ejaculating.

15.    On February 24, 2025, while conducting surveillance on the PREMISES, an SA with HSI in Grand Rapids, Michigan observed an individual matching STEELE's known height, weight, and hair color exit the residence located at 921 Cedar St., Niles, Michigan 49120 (the PREMISES), enter a white Chevrolet Silverado, with a ladder rack on top, bearing Michigan license plate EWT473 (hereinafter referred to as "the VEHICLE"), and then depart from the PREMISES.

16.    On February 26, 2025, in the United States District Court for the Western District of Texas, STEELE was charged for production of child pornography, in violation of 18 U.S.C. § 2251(a) and (e), and transfer of obscene matter to a minor, in violation of 18 U.S.C. § 1470, and STEELE is the subject of an arrest warrant issued on February 26, 2025.

## BACKGROUND ON COMPUTERS AND CHILD PORNOGRAPHY

17.    Based on my knowledge, training, and experience in child exploitation and child pornography investigations—and the experience and training of other law enforcement officers with whom I have had discussions—computers, including cellular phones, computer technology, and the Internet have revolutionized the manner in which child pornography is produced and distributed.

18.    Computers, electronic communication devices, and electronic service providers (i.e., social media websites and cloud storage services), serve four basic functions in connection with child pornography: production, communication, distribution, and storage.

19.    Child pornographers can transpose photographic images from a camera into a computer-readable format with a scanner. With digital cameras, the images can be transferred directly onto a computer. A modem allows any computer to connect to another computer through the use of a telephone, cable, or wireless connection. Through the Internet, electronic contact can be made to literally millions of computers around the world.

20.    The computer, electronic communication device, and electronic service provider's ability to store images in digital form makes the computer itself an ideal repository for child

pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution.

21.     The Internet affords collectors of child pornography several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

22.     Collectors and distributors of child pornography also use online resources to retrieve and store child pornography. These online services allow a user to set up an account with a remote computing service that provides electronic storage of computer files in a variety of formats. A user can set up an online storage account from any computer with access to the Internet. Evidence of such online storage of child pornography is often found on the user's computer.

## **TECHNICAL TERMS**

23.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.     Internet Protocol Address: An Internet Protocol address ("IP address") is a unique numeric address used by devices on the Internet. Every device attached to the Internet must be assigned a public IP address so that Internet traffic sent from and directed to that device may be directed properly from its source to its destination. An IP address acts much like a home or business street address—it enables devices connected to the Internet to properly route traffic to each other. Devices connected to the Internet are assigned public IP addresses by Internet service providers ("ISPs"). There are two types of

IP addresses: IPv4 (Internet Protocol version 4) and IPv6 (Internet Protocol version 6). An IPv4 address has four sets ("octets") of numbers, each ranging from 0 to 255, separated by periods (e.g., 149.101.82.209). An IPv6 address has eight groups ("segments") of hexadecimal numbers, each ranging from 0 to FFFF, separated by colons (e.g., 2607:f330:5fa1:1020:0000:0000:0000:00d1).

      b.     Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

      c.     Storage medium: A storage medium is any physical object upon which computer data can be recorded.  Examples include mobile or cellular telephones, hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

24.    As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media, including mobile or cellular telephones.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

25.    *Probable cause.*  I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from

operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

        d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

26.    *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files and information that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium on the PREMISES because:

        a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was

in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of

computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

27.     *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage

media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

  a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

  b. Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

   c. Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

28. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## BIOMETRIC UNLOCK

29. The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant.  I seek this authority based on the following:

   a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition

features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.       If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.       If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d.       In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient

20

way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.    As discussed in this continuation, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.    I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter

a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.      In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

h.      Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law

enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## <u>CONCLUSION</u>

30.    I submit that this continuation supports probable cause for a warrant to search the SUBJECT PERSON described in Attachments A-1 and the PREMISES described in Attachment A-2 and seize the items described in Attachment B.